**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **MALAYSIA PEREZ-LOCKHART** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No.** \_\_3:25cv370\_\_ |
| | ) |
| **EQUIFAX INFORMATION SERVICES, LLC** | ) |
| SERVE:   Corporation Service Company, Reg. Agent | ) |
|           100 Shockoe Slip, FL 2 | ) |
|           Richmond, VA 23219-4100 | ) |
| | ) |
| **EXPERIAN INFORMATION SOLUTIONS, INC.,** | ) |
| SERVE:   CT Corporation System, Reg. Agent | ) |
|           4701 Cox Rd., Ste. 285 | ) |
|           Glen Allen, VA 23060-6808 | ) |
| | ) |
| | ) |
| | ) |
| **TRANS UNION, LLC,** | ) |
| SERVE:   Corporation Service Company, Reg. Agent | ) |
|           100 Shockoe Slip, FL 2 | ) |
|           Richmond, VA 23219-4100 | ) |
| | ) |
| | ) |
| **and** | ) |
| | ) |
| **CAPITAL ONE, NATIONAL ASSOCIATION** | ) |
| SERVE:   Corporation Service Company, Reg. Agent | ) |
|           100 Shockoe Slip, FL 2 | ) |
|           Richmond, VA 23219-4100 | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Malaysia Perez-Lockhart, by counsel, and for her Complaint against Defendants Equifax Information Services, LLC ("Equifax), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and Capital One, National Association ("Capital One"), she states as follows:

### PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorneys' fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.      Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (the "CRAs" or "CRA Defendants").

3.      The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4.      Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local

law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5.      Not only do inaccurate consumer reports lead to discrimination against consumers, but they also make it more difficult for banks and other finance companies to efficiently extend offers of credit to qualified individuals. The most obvious example occurs when a consumer applies for credit, is subsequently denied due to inaccurate information on their report, and the lender loses what would have been a potential customer. The inaccuracies not only harm the consumer, but they also deny the potential lender an opportunity to assess that consumer's creditworthiness accurately.

6.      In addition to relying on consumer reports to evaluate direct credit applications, many companies use CRAs to "prescreen" consumers' eligibility for particular offers.

> In prescreening, a creditor or insurer establishes a set of specific credit criteria (such as a minimum credit score) and requests from a CRA the names, addresses, and certain other information on consumers in the CRA's database who meet the specified criteria. Alternatively, the creditor or insurer may provide a list of potential customers to the CRA and request that the CRA identify which consumers on that list meet the established credit criteria.

BD. OF GOVERNORS OF THE FED. RESERVE SYS., *Report to the Congress on Further Restrictions on Unsolicited Written Offers of Credit and Insurance*, 7 (2004), Available at https://www.federalreserve.gov/boarddocs/rptcongress/UnsolicitedCreditOffers2004.pdf.

7.      If there is inaccurate information on a consumer's report, the CRA and lender may wrongfully exclude that consumer from certain "prescreened" offers. In this situation, the inaccuracies both preclude the individual consumer from receiving the credit offers and impede the lender's ability to use prescreening as a tool for "market efficiencies and better control of risks" *See, e.g., id.* at 10.

8.     The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

9.     The FCRA's accuracy provision demands that CRAs take actual steps to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Capital One, particularly when a consumer makes a dispute about information reported.

10.     Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, those entities are Capital One (the "Defendant Furnisher"), American Express ("AMEX"), Bank of America ("BOA"), Barclays Bank Delaware ("Barclays"), CitiBank ("Citi"), Cavalry Portfolio Services ("Cavalry"), Comenity Bank ("Comenity"), Credit Collection Services ("CCS"), Discover Bank ("Discover"), JPMorgan Chase Bank ("JPMCB"), Portfolio Recovery Services ("Portfolio"), and Resurgent Capital Services/LVNV Funding ("Resurgent/LVNV") (collectively, the "Furnishers"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

11.     Plaintiff brings claims under Section 1681e(b) against Equifax, Trans Union and Experian because each reported inaccurate account information about Plaintiff, including inaccurate information regarding a fraudulent account with Defendant Furnisher Capital One, and fraudulent accounts with the remaining Furnishers. When Plaintiff disputed the inaccuracies, Equifax, Trans Union, and Experian did not reasonably investigate, also violating Section 1681i.

12.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how Equifax, Trans Union, and Experian have complied with their over 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Trans Union and Experian have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

13.     Likewise, Capital One violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all Capital One did was consult its own records regarding the account and confirm to the agencies the inaccurate information it was already reporting. Capital One failed to correct the fraudulent reporting on Plaintiff's credit despite receiving ample notice that Plaintiff is a victim of identity theft.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

15.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(1) & (2). All Defendants are residents of the Commonwealth of Virginia, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

## PARTIES

16.     Plaintiff is a natural person who resided in the State of Indiana at all times relevant to the Complaint and was a "consumer" as defined by 15 U.S.C. § 1681a(c). Plaintiff is currently a resident of Kentucky.

17.     Equifax is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

18.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

19.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

20.     Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, VA.

21.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

22.     Experian disburses consumer reports to third parties under contract for monetary compensation.

23.     Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

24.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

25.    Trans Union disburses consumer reports to third parties under contract for monetary compensation.

26.    Capital One, National Association ("Capital One" or "Defendant Furnisher") is a national bank headquartered in the Commonwealth of Virginia. Capital One does business through its registered agent in Richmond, VA.

27.    Capital One is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.


## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

28.    "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

29.    "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

30.    Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic....
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA....
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party....
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

31.    Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

32.    Section 1681i(a), on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency of the directly… of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

33.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

34.    It has long been the law that a CRA, such as Equifax, Trans Union or Experian, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781

F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

35.      That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).  Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

36.      As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

37.      Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or

certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

38.    It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT (July 2011), at 67.[1]

### Sections 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers Such as Capital One to Perform a Detailed and Systematic Investigation of a Consumer's Dispute

39.    Today, furnishers such as Capital One have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2. The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

40.    Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of this investigation to the CRAs and accurately

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

correct, update, or delete incorrect information previously reported to the CRAs.

41.     "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

> 357 F.3d 426, 430 (4th Cir. 2004).

42.     Additionally, Capital One has long been aware that a furnisher must fully and accurately report to the CRAs the results of its investigation, including whether or not the consumer disputes such reporting. *Saunders v. Branch Banking and Tr. Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Creditor's failure to report disputed nature of debt to all credit reporting agencies (CRAs), after receiving notice of dispute from one CRA, and conducting investigation and verification, was cognizable as violation of Fair Credit Reporting Act's (FCRA) duty to review and update reports for inaccuracies and omissions.)

### *Plaintiff Discovers the CRA Defendants were Reporting Fraudulent Accounts and Disputes Those Inaccuracies*

43.     Plaintiff is a victim of identity theft.

44.     An identity thief used Plaintiff's personal information, without Plaintiff's permission, to open numerous fraudulent accounts in Plaintiff's name.

45.     Plaintiff was incarcerated during the time that the fraudulent accounts were opened and did not have the ability to open any credit card accounts or take out any loans.

46.     In or around May and June of 2023, Plaintiff obtained copies of her credit files with the CRA Defendants and discovered that all three were reporting inaccurate and derogatory

information, resulting from fraud, regarding several accounts—including accounts with Capital One, AMEX, BOA, Barclays, CPS (collecting for Citi), Discover, JPMCB, and Portfolio (collecting for both Capital One and Barclays).

47.     Plaintiff did not open any of the fraudulent accounts, she did not authorize anyone to open any of the fraudulent accounts on her behalf, and she did not benefit from any of the fraudulent accounts.

48.     In or around December of 2023, Plaintiff mailed written dispute letters to the three Defendant CRAs via USPS first class certified mail, return receipt requested.

49.     In her December 2023 dispute letter to Equifax, Plaintiff disputed Equifax's inaccurate and derogatory reporting of: a charged off account with Capital One, a charged off account with AMEX, a charged off account with Barclays, a charged off account with BOA, a charged off account with Discover, a charged off account with JPMCB, and two collection accounts with Portfolio. Plaintiff explained that she had been incarcerated from 2014 to 2021 and was not in a position to open any accounts. Plaintiff had the letter notarized and included a copy of her driver's license with the letter so Equifax would know that Plaintiff legitimately sent the dispute.

50.     In her December 2023 dispute letter to Experian, Plaintiff disputed the fraudulent information that Experian was reporting, specifically: a charged off account with Capital One, a charged off account with AMEX, a charged off account with Barclays, a charged off account with BOA, a collection account with Cavalry (collecting for Citi), a collection account with CCS (collecting for Liberty Mutual Insurance Co.), a charged off account with Discover, a charged off account with JPMCB, and two collection accounts with Portfolio. Plaintiff explained that she had been incarcerated from 2014 to 2021 and was not in a position to open any accounts. Plaintiff had

the letter notarized and included a copy of her driver's license with the letter so Experian would know that Plaintiff legitimately sent the dispute.

51.    In Plaintiff's December 2023 dispute letter to Trans Union, she disputed the fraudulent accounts on her Trans Union report: a charged off account with Capital One, a charged off account with AMEX, a charged off account with Barclays, a charged off account with BOA, a charged off account with Discover, a charged off account with JPMCB, a charged off account with Cavalry (collecting for Citi), and two collection accounts with Portfolio (collecting for Barclays and Capital One). Plaintiff explained that she had been incarcerated from 2014 to 2021 and was not in a position to open any accounts. Plaintiff had the letter notarized and included a copy of her driver's license with the letter so Trans Union would know that Plaintiff legitimately sent the dispute.

52.    On or around December 19, 2023, Equifax mailed a letter to Plaintiff—after receiving Plaintiff's notarized dispute letter—asking Plaintiff for additional proof of her identification.

53.    On or around January 2, 2024, Equifax mailed a letter to Plaintiff with information from the Consumer Financial Protection Bureau regarding "Remedying the Effects of Identity Theft."

54.    On or around January 21, 2024, Equifax mailed a letter to Plaintiff stating, in part, that it was not blocking the information that Plaintiff named in her request.

55.    Upon information and belief, even though Equifax acknowledged receipt of Plaintiff's December 2023 dispute letter, Plaintiff did not receive a timely dispute response from Equifax following her December 2023 dispute.

56.    Upon information and belief, Equifax did not conduct an investigation in response to Plaintiff's December 2023 dispute.

57.    Following Plaintiff's December 2023 dispute to Equifax, Equifax continued to report inaccurate and derogatory information on Plaintiff's credit regarding: a charged off account with Capital One, a charged off account with JPMCB, a charged off account with Discover, a charged off account with Barclays, a charged off account with AMEX, two collection accounts with Portfolio, and a collection account with LVNV funding.

58.    Upon information and belief, even though Plaintiff's December 2023 dispute letter was picked up by an Experian agent on December 14, 2023 (USPS tracking number 9589071052700592985140), Plaintiff did not receive a timely dispute response from Experian following her December 2023 dispute.

59.    Upon information and belief, Experian did not conduct an investigation in response to Plaintiff's December 2023 dispute.

60.    Following Plaintiff's December 2023 dispute to Experian, Experian continued to report inaccurate and derogatory information on Plaintiff's credit regarding: a charged off account with Capital One, a charged off account with JPMCB, a charged off account with Discover, a charged off account with Barclays, a charged off account with AMEX, a collection account with Cavalry, two collection accounts with Portfolio, and a collection account with Resurgent and LVNV funding.

61.    In or around December 30, 2023, Trans Union mailed "Investigation Results" to Plaintiff in response to her December 2023 dispute. Trans Union told Plaintiff that the following furnishers had "verified" that the information belonged to her: Capital One, AMEX, Barclays,

JPMCB, Portfolio (for both accounts), Cavalry, and Discover. Trans Union did not address Plaintiff's dispute of the BOA account.

62.    Upon information and belief, as part of its response to Plaintiff's December 2023 dispute letter, Trans Union failed to provide Plaintiff with "a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation . . ." as required by 15 U.S.C. § 1681i(a)(6)(B)(ii).

63.    Following Plaintiff's December 2023 dispute to Trans Union, Trans Union continued to report inaccurate and derogatory information on Plaintiff's credit regarding the fraudulent accounts.

64.    On or around February 14, 2024, Plaintiff mailed a second set of dispute letters to Defendant CRAs Equifax and Experian via USPS certified mail, return receipt requested.

65.    In her February 2024 letter to Equifax, Plaintiff again disputed the following accounts that were opened as a result of fraud: a charged off account with Capital One, a charged off account with AMEX, a charged off account with Barclays, a charged off account with BOA, a charged off account with Discover, a charged off account with JPMCB, and two collection accounts with Portfolio. Plaintiff explained that she had been incarcerated from 2014 to 2021 and was not in a position to open any accounts. Plaintiff had the letter notarized and included a copy of her driver's license so Equifax would know that Plaintiff legitimately sent the dispute.

66.    Upon information and belief, Plaintiff did not receive a timely dispute response from Equifax following her February 2024 dispute.

67.    Upon information and belief, Equifax received Plaintiff's February 2024 dispute

68.    Upon information and belief, Equifax did not conduct a reinvestigation in response to Plaintiff's February 2024 dispute.

69.    In her February 2024 dispute letter to Experian, Plaintiff disputed the fraudulent information that Experian was reporting, specifically: a charged off account with Capital One, a charged off account with AMEX, a charged off account with Barclays, a charged off account with BOA, a collection account with Cavalry (collecting for Citi), a collection account with CCS (collecting for Liberty Mutual Insurance Co.), a charged off account with Discover, a charged off account with JPMCB, and two collection accounts with Portfolio. Plaintiff explained that she had been incarcerated from 2014 to 2021 and was not in a position to open any accounts. Plaintiff had the letter notarized and included a copy of her driver's license with the letter so Experian would know that Plaintiff legitimately sent the dispute

70.    Upon information and belief, Plaintiff did not receive a timely dispute response from Experian following her February 2024 dispute.

71.    Upon information and belief, Experian received Plaintiff's February 2024 dispute.

72.    Upon information and belief, Experian did not conduct a reinvestigation in response to Plaintiff's February 2024 dispute.

73.    On or around April 26, 2024, Plaintiff obtained new copies of her credit files with the Defendant CRAs and discovered that, in addition to the many fraudulent accounts that she had already disputed, all three Defendant CRAs were reporting an inaccurate and derogatory collection account with Resurgent/LVNV Funding ("Resurgent/LVNV"). In addition, Plaintiff learned that CRA Defendants Trans Union and Experian were reporting an account with Comenity on Plaintiff's credit that did not belong to her.

74.    On or around April 27, 2024, Plaintiff mailed a third set of disputes to each of the Defendant CRAs via USPS certified mail, return receipt requested.

75.     In her April 2024 dispute to Equifax, Plaintiff disputed all the accounts she had disputed previously, as well as the new fraudulent Resurgent/LVNV account. Plaintiff had the letter notarized and included a copy of her driver's license with the letter so Equifax would know that Plaintiff legitimately sent the dispute.

76.     In her April 2024 dispute to Experian, Plaintiff disputed all the accounts she had disputed previously, as well as the new fraudulent Resurgent/LVNV account and the new fraudulent Comenity account. Plaintiff had the letter notarized and included a copy of her driver's license so Experian would know that Plaintiff legitimately sent the dispute.

77.     In her April 2024 dispute to Trans Union, Plaintiff disputed all the accounts she had disputed previously, as well as the new fraudulent Resurgent/LVNV account and the new fraudulent Comenity account. Plaintiff had the letter notarized and included a copy of her driver's license so Trans Union would know that Plaintiff legitimately sent the dispute.

78.     Plaintiff did not receive a timely response (or any response) from Equifax following her April 2024 dispute

79.     Upon information and belief, Equifax received Plaintiff's April 2024 dispute

80.     Upon information and belief, Equifax did not conduct an investigation in response to Plaintiff's April 2024 dispute.

81.     Plaintiff did not receive a timely response (or any response) from Experian following her April 2024 dispute

82.     Upon information and belief, Experian received Plaintiff's April 2024 dispute

83.     Upon information and belief, Experian did not conduct an investigation in response to Plaintiff's April 2024 dispute.

18

84.    Plaintiff did not receive a timely response (or any response) from Trans Union following her April 2024 dispute.

85.    Upon information and belief, Trans Union received Plaintiff's April 2024 dispute

86.    Upon information and belief, Trans Union did not conduct an investigation in response to Plaintiff's April 2024 dispute.

87.    Upon information and belief, each Defendant is still reporting inaccurate and derogatory information regarding Plaintiff.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

88.    Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Trans Union, and Experian to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsourced vendor located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

89.    Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

90.    Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

communication. That mailbox company receives consumer disputes and scans them into a batch with other disputes.

91.    Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

92.    Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

93.    Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

94.    The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

95.    In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian. The dispute is sent to the Defendant CRAs' creditor customers (such as Capital One) for their sole review and consideration.

96.    Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance. For example, under oath before another court, Equifax's

20

representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

97.    Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

98.    Regardless of whether these statements by the CRAs are correct, the consumer reporting agencies believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

99.    Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused the disputes to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Capital One, Who Did Nothing

100.    In each instance in which Plaintiff disputed the Capital One account with the CRAs, the CRAs forwarded Plaintiff's disputes to Capital One using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results are electronically communicated back to CRAs.

101.    On information and belief, e-Oscar is also the system by which Capital One has agreed it will accept consumer disputes from the CRAs.

102.    Each instance in which Capital One received one of Plaintiff's disputes from a CRA, Capital One became obligated under the FCRA to investigate that dispute.

103.    Plaintiff's disputes to Capital One to attempt to have it investigate her complaints went unanswered.

104.    Capital One failed to investigate Plaintiff's complaints.

105.    Despite Plaintiff providing Capital One with ample notice that she is a victim of identity theft and she does not owe the debt, Capital One continued (and continues still) to report the fraudulent account as "accurate" to the CRAs. Discovery will show that all Capital One did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

106.    On dates better known to Equifax and Capital One, Equifax furnished Plaintiff's disputes to Capital One.

107.    On dates better known to Experian and Capital One, Experian furnished Plaintiff's disputes to Capital One.

108.    On dates better known to Trans Union and Capital One, Trans Union furnished Plaintiff's disputes to Capital One.

109.    At least one of the Defendant CRAs responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to Capital One.

110.    Upon information and belief, the Defendant CRAs timely notified Capital One of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

111.    Alternatively, the Defendant CRAs failed to notify Capital One of Plaintiff's disputes, and/or failed to provide the supporting documents submitted with Plaintiff's disputes.

112.    By its actions as described herein, Capital One furnished and communicated false credit information regarding Plaintiff.

### *Capital One Repeatedly Obtained and Used Plaintiff's*
### *Consumer Report(s) Without a Permissible Purpose*

113.    Accessing consumer reports is presumptively illegal. To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681(f).

114.    One such permissible purpose that arises in the credit realm is for reports to issue "[t]o a person which [the reporting agency] has reason to believe—A intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

115.    Likewise, Courts have long held that reports issued to a user involving an extension of credit or for collection purposes as to credit fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could

rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

116.    Apart from 15 U.S.C. § 1681b(a)(3)(A), no other permissible purpose could conceivably allow Capital One to access Plaintiff's consumer reports.

117.    Capital One first illegally accessed Plaintiff's credit file in connection with its issuance of the fraudulent credit card account in or around May of 2017. The information Capital One received purportedly authorizing it to access Plaintiff's consumer report(s) bore multiple hallmarks of identity theft. Even a cursory evaluation of the information submitted to Capital One to purportedly authorize it to access Plaintiff's credit report to issue a credit card account would have revealed that the credit card application was fraudulent. Nonetheless, Capital One illegally accessed Plaintiff's consumer report(s) and then issued a fraudulent credit card account based on those consumer report(s).

118.    But for Capital One's illegal access of Plaintiff's consumer reports, the fraudulent credit card account would not have been issued.

119.    Capital One continued to illegally access Plaintiff's consumer report(s) numerous times, including (but not limited to) on: 06/03/2023, 07/01/2023, 08/25/2023, 09/23/2023, 10/20/2023, 12/16/2023, 01/13/2024, 02/09/2024, 04/05/2024, 05/04/2024, 05/31/2024, 07/26/2024, 08/24/2024, 09/21/2024, and 10/08/2024.

120.    Capital One used information from one or more illegally obtained consumer report(s) regarding Plaintiff to illegally issue a credit card account in Plaintiff's name, and then illegally attempt to collect on a debt that Plaintiff never owed.

*Plaintiff Suffered Actual Harm*

121.   The Defendants continued to report the derogatory Furnisher accounts, including the derogatory Capital One account, on Plaintiff's credit reports even after being notified that this information is false. Upon information and belief, the Defendants are *still* reporting the fraudulent information on Plaintiff's credit file.

122.   Plaintiff attempted to resolve these matters with Defendants and her credit was significantly destroyed by Defendants' failures to correct the inaccurate reporting.

123.   As a result of the inaccurate credit reporting and illegal use of Plaintiff's reports, Plaintiff has suffered damages, including, but not limited to:

   a.   Harm to Plaintiff's credit opportunities;

   b.   Fear of being denied credit;

   c.   Apprehension in applying for new credit or housing;

   d.   Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

   e.   Loss of time attempting to correct the inaccuracies;

   f.   Stress associated with attempting to resolve this matter;

   g.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

### *Defendants' Conduct was Willful*

124.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

125.    Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

126.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

127.    The CRA Defendants have received numerous disputes and other complaints regarding the furnisher at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

128.    Just in federal court alone, during the past decade, the creditor-furnishers disputed by Plaintiff have had to defend approximately 6,513 consumer credit lawsuits. Of these consumer credit lawsuits, approximately 2,382 were against Defendant Furnisher Capital One.

129.    In many of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

130.    The CRA Defendants knew or should have known of this litigation history.

131.    The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

132.    The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

133.    Each Defendant regularly receives unredacted consumer dispute details from this database.

134.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

135.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

136.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

137.    Further, over 230,000 of the CFPB complaints against Equifax, more than 220,000 complaints as to Trans Union, and over 230,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

138.    Just in the last 12 months alone, Equifax, Trans Union and Experian have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

139.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

140.    Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

141.    Equifax has even been warned by its home District Court, the Northern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this

does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.

To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

142.    Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

143.    Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

144.    In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with

the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

145.    The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

146.    In early 2025, almost two decades after the AG settlement, the Consumer Financial Protection Bureau sued CRA Defendant Experian, seeking injunctive relief, redress, disgorgement, and civil money penalties. In its Complaint, CFPB alleged that:

> Experian violated both [the Fair Credit Reporting Act and the Consumer Financial Protection Act of 2010] by failing to reasonably reinvestigate consumer disputes challenging the accuracy or completeness of information in consumer reports, including by failing to forward all relevant information to furnishers, failing to provide adequate or accurate notice to consumers of the outcome of their disputes, and failing to utilize reasonable procedures to ensure the accuracy and completeness of information in consumers' files.

*Consumer Fin. Prot. Bureau v. Experian Information Solutions, Inc.*, 8:25cv24 (C.D. Cal. Filed Jan. 7 2025).[4]

147.    As the CFPB summarized, "Despite its obligations under the FCRA, Experian fails consumers who dispute information in their consumer reports at every step of the dispute process." *Id.*

148.    Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also

---

[3]    *Available    at*    https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.
[4] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_experian-information-solutions-complaint_2025-01.pdf

published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[5]

149. The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

150. Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

---

[5] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

151.    The overwhelming amount of public criticism and growing awareness of the CRAs' failures has led at least one Defendant CRA, Experian, to frequently push for arbitration in lieu of litigation. Addressing so many cases though arbitration has lowered Experian's exposure to justice through the court system. However, arbitrators recognize the substantial amount of evidence demonstrating that Experian willfully disregards the rights of consumers under the FCRA, and they are awarding damages accordingly. In *Duncan v. Experian Information Solutions, Inc.*, which shared many similarities to the underlying facts in this case, Experian reported inaccurate information from PNC Bank on Mr. Duncan's Experian credit report. Although Mr. Duncan disputed the information with Experian, Experian failed to conduct any actual "reinvestigation" of Mr. Duncan's disputes, as required by Section 1681i of the Federal Fair Credit Reporting Act. Instead, Experian relied entirely on the information sent to it by the "furnisher", PNC Bank. The arbitrator in the Duncan case ordered Experian to pay Mr. Duncan "for actual damages $400,000, together with $50,000 for each month it continues to report the PNC information, up to a maximum of another $300,000." The arbitrator further found Experian's violations to be willful, and ordered that Experian pay Mr. Duncan $700,000 in punitive damages.

152.    Proportionately similar, Capital One has also been sued in federal court almost 2,400 times for consumer credit claims by consumers – many involving alleged violations of the FCRA.

153.    Further, Since the CFPB database began accepting complaints, Capital One has received over 15,000 complaints from consumers for reporting inaccurate information on consumer credit reports. Over 3,300 of these complaints are about Capital One not fixing a credit reporting error after receiving a consumer's dispute.

154.    Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

155.    Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

156.    Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

157.    Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

158.    Capital One had notice of and its lawyers or other management employees responsible for FCRA compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

159.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because they believe it would cost too much money to do so.

160.    Defendants' procedures imposed on Plaintiff an unjustifiable and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681e(b)
*against Equifax, Experian, and Trans Union*

161.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

162.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the inaccurate account information from Defendant Furnisher Capital One and the other Furnishers.

163.    As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. §1681e(b) Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

164.    Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax, Trans Union, and Experian each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

165.    Equifax, Trans Union, and Experian each furnished multiple consumer reports to third parties containing the inaccurate collection information and they did so after receiving notice of these inaccuracies.

166.    The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

167.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681i(a)**
*against Equifax, Experian, and Trans Union*

168.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

169.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff' credit files.

170.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(2) by their conduct which includes, but is not limited to, failing to send to the furnishers all relevant information that they received with Plaintiff's disputes.

171.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff as to the Furnisher accounts.

172.    Equifax, Trans Union, and Experian each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the items of information upon a lawful reinvestigation.

173.    After receiving Plaintiff's December 2023 letters, Equifax and Experian each violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

174.    After receiving Plaintiff's December 2023 letter, Trans Union failed to provide Plaintiff with "a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation . . .", in violation of 15 U.S.C. § 1681i(a)(6)(B)(ii).

175.    After receiving Plaintiff's April 2024 dispute letter, Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(6) by failing to provide written notice to Plaintiff of the results of a reinvestigation not later than 5 days after the completion of a reinvestigation.

176.    As a result of Equifax's, Trans Union's, and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

177.    The violations by Equifax, Trans Union and Experian were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by

36

the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Trans Union, and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

178.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Trans Union, and Experian in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(A) & (B)**
*against Capital One*

179.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

180.    Defendant Capital One violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after her disputes were furnished directly to it by Equifax, Experian, and Trans Union.

181.    Defendant Capital One violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes to Capital One.

182.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

183.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

184.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT IV
### VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(C) & (D)
*against Capital One*

185.    Plaintiff realleges and incorporates all factual allegations in the Complaint as if fully set out herein.

186.    On one or more occasions within the past two years, by example only and without limitation, Capital One violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the false information within Plaintiff's credit files with the Defendant CRAs in response to her disputes without also including an accurate notation that the debt was disputed and by failing to correctly report results of an accurate investigation to the Defendant CRAs.

187.    On information and belief, Plaintiff alleges that Capital One rarely if ever adds the correct notation indicating that the account is disputed when it responds to the e-Oscar ACDVs.

188.    Plaintiff's disputes were, at minimum, bona fide.

189.    As a result of these violations of 15 U.S.C. § 1681s-2(b)(C) and (D), Plaintiff suffered actual damages including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and

humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

190.    Capital One was aware of the *Saunders v. Branch Banking & Trust* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

191.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Capital One intended its employees or agents to follow.

192.    On information and belief, Plaintiff alleges that Capital One's employees or agents did not make a mistake in the way they followed Capital One's procedures when they received, processed and responded to the Defendant CRAs ACDVs and did not include a proper notation regarding the account being in dispute.

193.    On information and belief, the Plaintiff alleges that Capital One has not materially changed its FCRA investigation procedures regarding the notation of a dispute in ACDVs after learning of its failures in this case.

194.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

195.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V**
**VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681s-2(b)(E)**
***against Capital One***

196.    Plaintiff realleges and incorporates all factual allegations in the Complaint as it fully set out herein.

197.    Defendant Capital One violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from the CRAs and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Capital One's failure to investigate as articulated herein, after Capital One received notice of Plaintiff's disputes from the CRAs.

198.    As a result of this conduct (the action and inaction of Capital One), Plaintiff suffered actual damages, including but not limited to: costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

199.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

200.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT VI
## VIOLATIONS OF FAIR CREDIT REPORTING ACT 15 U.S.C. § 1681b(f)
### *against Capital One*

201.    Plaintiff realleges and incorporates all factual allegations in the Complaint as it

fully set out herein.

202.    Capital One repeatedly violated 15 U.S.C. § 1681(b)(f) by unlawfully obtaining Plaintiff's consumer reports without her written authorization or a permissible purpose.

203.    Capital One also violated 15 U.S.C. § 1681b(f) by failing to accurately and lawfully certify a permissible purpose when accessing Plaintiff's consumer report(s).

204.    Plaintiff's consumer report(s) contained a wealth of private information which Capital One had no right to access absent a specific Congressional license to do so.

205.    As a result of Capital One's conduct, action, and inaction, Plaintiff suffered actual damages, including but not limited to invasion of her statutory right to confidentiality of her personal information, issuance of a fraudulent credit account in her name, costs associated with disputing the inaccurate information, harm to credit, loss of credit opportunities, depression and anxiety, headaches, back and shoulder pain, heart palpitations, irritability, sleep loss, changes in weight, embarrassment and humiliation, harm to relationships, difficulty concentrating, harm to job performance, harm to reputation, and loss of privacy.

206.    The violations by Capital One were willful, rendering Capital One liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Capital One was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o. Plaintiff does not seek joint liability.

207.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Capital One in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Equifax, Experian, Trans Union, and Capital One;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

MALAYSIA PEREZ-LOCKHART

By:

/s/ *Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Mark C. Leffler, VSB #40712
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662- Fax
Email: lenbennett@clalegal.com
Email: mark@clalegal.com

Drew D. Sarrett, Esq., VSB #81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
(804) 905-9900 - Telephone
(757) 930-3662 - Fax
Email: drew@clalegal.com

*Counsel for Plaintiff*